**Josephine Di Marco, by Santo Di Marco, Appellee, v. Chicago & Riverdale Lumber Company, Appellant.**

**Gen. No. 25,723.**

1. MASTER AND SERVANT, § 836*—*when negligence of servant is imputable to master.* The negligence of the servant is imputable to the master only if the relation of master and servant existed at the time and in respect to the particular transaction out of which the injury arose.

2. MASTER AND SERVANT, § 836*—*when separate business is part of master's business.* Where a corporation engaged in dealing in lumber was unable to sell completely glazed sashes in the city, because of an agreement with a labor union, and a branch "glass works" was organized, the jury were authorized in finding that such glass works was a part of the corporation's business, it appearing that the manager and superintendent of the corporation

---

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

Di Marco v. Chicago & Riverdale Lumber Co., 220 Ill. App. 354.

gave orders to employees of the glass works, and there being other evidence justifying the finding.

3.   MASTER AND. SERVANT, § 868*—*when question of employment is for jury.*   Where a manager of a corporation ordered an employee of a separate business, but which was part of the corporation's business, to take a car to a garage, the questions whether the employee was a servant of the corporation, and whether he was engaged on an errand and within the scope of his employment, were for the jury.

4.   MASTER AND SERVANT, § 867*—*when finding as to existence of relation is sustained by evidence.*   In an action for injuries to a 4-year-old girl who was struck by an automobile, a finding of the jury in favor of the plaintiff was a finding that the employee in charge of the automobile was a servant of the corporation, engaged in an errand within the scope of his employment, and under the evidence such finding was warranted.

5.   AUTOMOBILES AND GARAGES, § 3*—*when finding of negligence is proper.*   In an action for injuries to a 4-year-old girl struck by an automobile, where the driver testified that the girl jumped in front of the machine, and that he had to turn to avoid tipping over, going a distance of some 25 feet, but where other witnesses testified that the car was going 25 or 30 miles an hour, that the driver was excited and stopped 50 or 75 feet from where the girl was lying after being run over, the verdict in favor of the plaintiff was not against the manifest weight of the evidence.

6.   DAMAGES, § 135*—*when verdict is not excessive.*   A verdict for $8,000 is not excessive where plaintiff, a girl 4 years old, retained a scar 2½ inches long above the right ear, another scar on the bridge of the nose, and a fracture of the jaw, giving it an asymmetrical appearance; and where the child, strong and healthy before, was chronically nervous after the accident.

Appeal from the Superior Court of Cook county; the Hon. FRANK JOHNSTON, JR., Judge, presiding.   Heard in the Branch Appellate Court at the October term, 1919.   Affirmed.ˈ Opinion filed December 31, 1920.   *Certiorari* denied by Supreme Court (making opinion final).

ARCHIBALD CATTELL and CARL A. WALDRON, for appellant.

FINN & MILLER, for appellee; WILLIAM M. JOHNSON, of counsel.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

MR. JUSTICE GRIDLEY delivered the opinion of the court.

By this appeal the Chicago & Riverdale Lumber Company, a corporation, defendant in the trial court, seeks to reverse a judgment against it for $8,000, rendered after verdict by the superior court of Cook county in an action for damages for personal injuries sustained by plaintiff, a little girl of 4 years of age, on Saturday afternoon, August 12, 1916, occasioned by being struck by an automobile then moving north on the east side of Prairie avenue, between 115th street and Kensington avenue, in the City of Chicago.

The action was commenced on November 13, 1916. Plaintiff's original declaration consisted of two counts. During the trial in March, 1919, plaintiff by leave of court withdrew the second count and filed in lieu thereof two additional counts. In the original first count it is alleged, in substance, that on August 12, 1916, the defendant "was in the possession and control of and was operating" a certain automobile; that defendant, "by one of its servants and agents who was then and there acting within the scope of its employment," was propelling the automobile upon and along said Prairie avenue, a public highway, between said cross streets; that plaintiff, a minor of 4 years of age, was then lawfully upon said public highway; and that defendant, by said servant and agent, so negligently operated said automobile that it ran upon and against plaintiff and she was thrown upon the pavement and seriously and permanently injured, etc. In the two additional counts the allegations as to defendant's possession, control and operation of the automobile are the same as in the original first count. In the first additional count it is charged that the defendant, by its said servant and agent, negligently propelled and operated the automobile at a rate of speed in excess of 10 miles per hour, in violation of the statute of the State of Illinois; and in the second additional

Di Marco v. Chicago & Riverdale Lumber Co., 220 Ill. App. 354.

count at a rate of speed in excess of 15 miles per hour, in violation of the statute. To all three of these counts the defendant filed a plea of the general issue, and also a special plea that defendant "did not own, operate or control" the automobile. It will be noticed that while the defendant in its special plea denies *ownership*, operation or control of the automobile, plaintiff, in all three counts, only alleged *possession*, operation and control by defendant.

The main point relied upon by counsel for defendant for a reversal of the judgment is, in substance, that though Arnold Wegeman, an employee of the defendant, was driving the automobile at the time of the accident, the relation of master and servant did not then exist between defendant and him in respect to the particular transaction or errand in which he was then engaged. Counsel here admit in their printed argument that "if Wegeman, as an employee of defendant, was, at the time of the accident, engaged in an errand for the defendant, within the scope of his employment, the defendant would be liable for Wegeman's negligence, whether the defendant owned the car or not." It is said in *Johanson v. William Johnston Printing Co.*, 263 Ill. 236, 240:

"The general rule is that a party injured by the negligence of another must seek his remedy against the person who caused the injury, since such person is alone liable. To this general rule the case of master and servant is an exception, and the negligence of the servant while acting within the scope of his employment is imputable to the master, but to bring a case within this exception it is necessary to show that the relation of master and servant exists between the person at fault and the one sought to be charged for the result of the wrong, and the relation must exist at the time and in respect to the particular transaction out of which the injury arose."

Much evidence was introduced on the trial, and the portions thereof pertinent to the point now under

discussion disclose, in substance, the following facts: The business of the defendant corporation was that of dealing in lumber. It also manufactured and sold window sashes, glazed and unglazed. Its principal office, yards and plant were at Riverdale, Cook county, Illinois, and E. S. Gamble was its president. It owned and operated a branch yard and plant, called the Kensington branch, at No. 11552 Michigan avenue, Chicago, of which branch Walter H. Ahrens was superintendent or manager at the time of the accident and had been for a considerable period of time prior thereto. He received a salary of $175 per month and a commission of one per cent on sales made at said branch, which compensation was not increased or diminished while he remained in that position. At the time of the trial he was employed as manager of defendant's branch at Tulsa, Oklahoma. At the main plant in Riverdale the defendant manufactured many window sashes, completely glazed, which it sold in districts outside of the City of Chicago. Because of an agreement with a labor union, completely glazed sashes were not sold by defendant in Chicago. Prior to February, 1916, completely glazed sashes were not manufactured at the Kensington branch. Ahrens testified: "They handled glass at the Riverdale yard, but not at the Kensington yard. They had no glaziers working for them. The glass was sold in the country and the company was not allowed to sell or set glass in the City of Chicago because of an agreement with the labor union." Prior to February, 1916, Ahrens had several conversations with August C. Rabe, a glazier, as to a plan for glazing sashes in connection with the business of defendant of manufacturing unglazed sashes at the Kensington branch, and later a conference was had between Ahrens, Rabe and Gamble, president of defendant, resulting in a decision to give the plan a trial and in the employment of Rabe, M. S. Prenatt, another

glazier, and others, by defendant. A part of the plan was, as we understand it from the testimony, that Ahrens, while remaining manager of said Kensington branch of defendant and continuing to perform his usual duties, was to become the "Calumet Glass Works," and when the Kensington branch sold completely glazed sashes to customers, Ahrens was to furnish the glass therefor, which he, in turn, would largely procure from defendant's factory at Riverdale. Accordingly, in February, 1916, a small room in the offices of the Kensington branch of defendant was fitted up; an inside sign, reading "Calumet Glass Works," was put up; a deposit of ($200) in a bank was made; a set of books opened; a stenographer and cashier installed, whose compensation however was thereafter paid solely by the defendant; and the "Calumet Glass Works" commenced doing business. It was not an incorporated company. Ahrens testified: "I owned the Calumet Glass Works myself.  *  *  * Before I formed the Calumet Glass Works, it (defendant) was doing practically nothing *locally* in the glass line.  *  *  * I was one of their (defendant's) customers—*one of their methods of distributing glass.*  *  *  * There was no profits of the Calumet Glass Works; it was a losing venture.  *  *  * The losses were absorbed in the final settlement.  *  *  * It went out of business about January, 1917." Prior to the day of the accident there were used in and about the Kensington branch three Ford automobiles— a truck, a five-passenger touring car, and "a roadster with a little box on the back of it about four feet long." The truck and the touring car were owned by defendant. The roadster, which struck plaintiff, was purchased by Ahrens in December, 1915, the purchase price paid in instalments by checks of the "Calumet Glass Works," the application for the State license for the year 1916 made by it, the license issued to it, No. 8,465, and the fee therefor paid by its check.

Ahrens testified, in substance, that prior to the accident said roadster was kept at a garage at No. 125 E. 115th street, that the glass works paid for its upkeep and the garage charges; that it was driven "principally" by employees of the glass works and used for the delivery of glass and for conveying laborers, and that it was never used in connection with the lumber business of the defendant. After the glass works ceased doing business the roadster became the property of the defendant. The touring car was used for business and pleasure by Ahrens; it was kept in a garage at Ahrens' home; it was used in connection with the lumber business of defendant as well as the business of the glass works; and Wegeman frequently drove it. Wegeman testified, in substance, that he was an employee of defendant; that Ahrens hired him about April, 1916, and that he performed duties as directed by Ahrens; that his main work was that of estimating and selling lumber in the Kensington yards; that he personally had delivered lumber to customers, at times using the truck and at other times the touring car; that he knew how to drive both and was familiar with Ford cars; that prior to the day of the accident he had never driven the roadster; that the usual quitting time for employees on Saturday afternoons was one o'clock; that he frequently remained at the yards on Saturday afternoons after quitting time for the purpose of making retail sales of lumber and immediately delivering the lumber; and that on the afternoon of the accident he was there for that purpose. Ahrens testified that on that day the men in the glazing shop had all quit at noon; that Rabe, the man who had been driving the roadster on that day, had gone home and had not put it in the garage; that about 4 o'clock in the afternoon he (Ahrens), on leaving defendant's office for home, noticed the roadster standing in front of the office; and that he directed Wegeman to drive it to the ga-

rage. Wegeman complied, and while on the way to the garage the accident happened.

From the facts as above outlined, and from other facts and circumstances disclosed in the record, we think that a jury would be warranted in inferring that the so-called "Calumet Glass Works" was organized for the purpose of increasing the business of defendant and was really a part of defendant's business; that by the use of its name and the manner in which the business was conducted the defendant, for a time at least, attempted to do indirectly, and did, the business of selling glazed sashes in Chicago, which it could not do directly and comply with its agreement with a labor union; that Ahrens, as manager and superintendent of defendant, gave orders to all employees at the Kensington branch whether engaged in the glass department or the lumber department; that on Saturday afternoon after quitting time some employees usually remained on duty for the purpose of making sales and immediate delivery of lumber; that one of the automobiles was usually left on the premises for use in making such deliveries; that on the afternoon in question it happened to be the roadster; and that at the time of the accident said roadster was in the possession and control of defendant, through its employee or servant, Wegeman, and was being operated by him within the scope of his employment, and was being returned to the place where it was usually housed after it was no longer needed on that day. And we are of the opinion that the questions, whether at the time of the accident the relation of master and servant existed between defendant and Wegeman and whether Wegeman was then engaged on an errand for the defendant and within the scope of his employment, were questions of fact for the jury to determine. (*Swancutt v. W. M. Trout Auto Livery Co.*, 176 Ill. App. 606, 611.) By their verdict the jury evidently answered these questions in the affirm-

362        APPELLATE COURTS OF ILLINOIS.

Di Marco v. Chicago & Riverdale Lumber Co., 220 Ill. App. 354.

ative, and we are not disposed to disturb their verdict, or to reverse the judgment on the grounds as above urged by counsel for defendant.

It is also contended that, on the question of Wegeman's alleged negligence, the verdict is against the manifest weight of the evidence. Three eyewitnesses of the accident testified for plaintiff and Wegeman for defendant. Wegeman testified, in substance, that at the time of the accident he was 18 years of age; that immediately after Ahrens had requested him to take the roadster to the garage, he drove east on Kensington avenue and then turned north on Prairie avenue; that when turning he had the car in low speed, going about 8 miles per hour, and when he got going north on the east side of Prairie avenue, about 2 feet away from the east curb, he changed into high speed and proceeded further north; that he noticed a ped-- dler's horse and wagon, loaded with vegetables, standing in the center of the street, the horse facing south; that he sounded his horn and kept going at a speed of about 10 miles per hour; that when going at that speed he could stop the car "within a foot or even less"; that just as he reached the end of the wagon, and was about 15 feet south of the alley, plaintiff "jumped right out in front of me and I gave my steering gear a jerk and the fender on the left-hand side caught her underneath the jaw. I was so close to the curb that the moment I gave the steering gear the twist, * * * the wheels started grinding against the curb, and it nearly upset the car. In order to right myself, I gave the steering gear another twist so I wouldn't tip over, and by that time I had passed the alley and stopped the machine * * * about ten feet past the alley towards the center of the road"; and that he got out, ran back and picked plaintiff up and carried her to a doctor's office in the vicinity. Two of plaintiff's witnesses testified that one of the front wheels ran over plaintiff and that the automobile

was going at the time from 25 to 30 miles per hour. One of said witnesses testified that plaintiff was crossing the street; that when she was about 15 feet from the east curb the automobile hit plaintiff; that the driver " was so excited, and he went  *  *  *  to turn out of the way, but it was done already"; that "he went pretty near the curbstone, and his car was tipped kind of, and he stopped 50 to 75 feet away from where the girl was lying." None of plaintiff's three witnesses made mention of seeing any peddler's horse and wagon on the street at the time. We are unable to say that the verdict is against the manifest weight of the evidence on the question as to whether or not Wegeman was guilty of negligence as charged.

It is further contended that the trial court erred in several rulings as to the admission or rejection of evidence. We have considered the various points made and are of the opinion that none of the rulings was so prejudicial to the defendant as to warrant the reversal of the judgment and the remanding of the cause.

And we do not think that the verdict is excessive. Plaintiff was seriously and permanently injured in the accident. The physician, to whose office she was taken immediately thereafter, testified, in substance, that she was then in an unconscious condition and bleeding from various parts of the body, as well as from the head, nose and ears and from under the eyes; that she had several cuts and bruises over the body and two small cuts on the scalp; that she sustained "a fracture of the lower right jaw, about the center of the symphysis, and a fracture at the bridge of the nose"; that she was taken to a hospital where she remained about 3 weeks; that she was unconscious for 2 days; that she was under his care for several months, he seeing her professionally about 16 times; that he wired the jaw together and then a "little inflammation of the bone developed, osteomyelitis, and we had to use a drain in the wound"; that the wound healed

nicely in time but there was "a permanent scar on the jaw on the end, giving it an asymmetrical appearance. * * * Both sides of the face don't look even"; that this asymmetry is permanent; that as to the nose there was a slight thickening of the bones which has left a ridge and a visible prominence; and that she suffered much pain while in the hospital and during subsequent treatments. Another physician, who examined her shortly before the trial, testified in substance, that he found that plaintiff had a wide scar, about 2½ inches long, above the right ear, and another scar of irregular shape at the bridge of the nose; that her lower jaw had been broken about in the middle of the chin, and that "by reason of the fracture, it is kind of pointed, a rabbit-shaped jaw"; and that in his opinion she was in a chronic nervous state, which had existed for some time. There was testimony given by plaintiff's parents and several neighbors that while before the accident she was apparently a strong, healthy child, she now appears to be weak and nervous.

We think the judgment should be affirmed, and it is so ordered.

*Affirmed.*

BARNES, P. J., and MATCHETT, J., concur.